UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AHOUVA STEINBERG,<br><br>                    Plaintiff,<br><br>          -against-<br><br><br>CUSHMAN & WAKEFIELD, INC., CUSHMAN &<br>WAKEFIELD 1, INC., CUSHMAN & WAKEFIELD<br>CAPITAL SERVICES, LLC, PINNACLE PROPERTY<br>MANAGEMENT SERVICES, LLC, CAPPELLI<br>DEVELOPMENT, LLC, CAPPELLI<br>ORGANIZATION, LLC, RFMCH HUGUENOT<br>PROPERTY OWNER, LLC,<br><br>                    Defendants. | Case No.<br><br><br>COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

1.      Plaintiff Ahouva Steinberg, by her attorneys, Crumiller P.C., as and for her complaint

against Cushman & Wakefield, Inc.; Cushman & Wakefield 1, Inc.; Cushman & Wakefield

Capital Services, LLC; Pinnacle Property Management Services, LLC (collectively "Cushman &

Wakefield"); Capelli Development LLC; Cappelli Organization LLC; and RFMCH Huguenot

Property Owner, LLC (collectively the "Cappelli Defendants", together with Cushman &

Wakefield, "Defendants") respectfully alleges as following:

**PRELIMINARY STATEMENT**

2.      Defendants are a large conglomerate that owns property across the United States.

Plaintiff Ahouva "Huvi" Steinberg is an openly gay woman who worked for Defendants as a

property manager in 2022, during which time she oversaw the residential property 3Thirty3.

3.      Steinberg's employment with Defendants was wrought with crude comments about her

body, invasive questions about her sexuality, inappropriate jokes about her Jewish faith and her

Jewish coworkers, and unfair treatment based on her asthma.

4.     Regional Property Manager Maya Liepa, Steinberg's supervisor, had an inappropriate fixation on her female employees' appearances, requiring them to "look hot" at work because "sex sells." After hiring Steinberg, Liepa informed Steinberg that she had only been offered the role "because [she is] pretty." Liepa regularly discussed Steinberg's physique, asking her about her weight and, on more than one occasion, telling Steinberg to "turn around and show [Liepa] her ass" or "show everyone [her] ass" during business meetings.

5.     Liepa also regularly harassed Steinberg about her sex life and sexual orientation. Liepa told Steinberg that she "didn't look gay," shouldn't tell anyone at work she was gay, and suggested that she should or would have sex with a man, often pointing out men and asking if Steinberg would "fuck" them.

6.     Following Steinberg's breakup with her girlfriend, Liepa began repeatedly asking Steinberg if she thought Liepa was pretty or if she was attracted to her – making Steinberg extremely uncomfortable.

7.     Liepa also graphically discussed her own sex life, unprompted, to Steinberg and other female employees, describing sex with her fiancé and repeatedly expressing her preference for sex with Black men.

8.     Liepa exhibited openly disparate treatment of female employees including Steinberg, and she regularly said she preferred working with men as they were "easier to work with" and "less emotional."

9.     Liepa was also openly retaliatory to Steinberg and other female employees. In May 2022, Steinberg unexpectedly had to take an afternoon off following an asthma attack. In response, Liepa mocked Steinberg's medical condition and began searching for dirt on her, instructing a fellow employee to "spy on Huvi [Steinberg]." When Steinberg suffered another asthma attack in

July 2022 on the way to work, Liepa badgered her while she was receiving medical attention and ordered her to come straight to the office from urgent care. In August 2022, Liepa also explicitly told Steinberg that she wanted to "bully" another female employee into quitting after she complained about Liepa's verbal harassment.

10.    On top of this gender-based discrimination and harassment, Liepa made antisemitic comments, including referring to a coworker as a "cheap Jew" and "Hitler." When Steinberg, who is Jewish, pointed out Liepa's antisemitism, Liepa called her a "snowflake" and refused to stop using these phrases.

11.    Indeed, each time Steinberg complained to Liepa, Liepa either downplayed or outright ignored her concerns and continued her offensive and harassing behavior.

12.    In the last week of August 2022, Steinberg learned that several other female employees had also complained about Liepa and that Liepa had been fired or asked to resign from previous jobs for similar reasons.

13.    On August 25, 2022, Steinberg emailed HR detailing the hostile work environment Liepa cultivated. The email was forwarded to the HR Manager, who did not respond.

14.    Following Steinberg's complaint, Liepa lodged a retaliatory false accusation against Steinberg, accusing her of completing a write off incorrectly, even though Steinberg had followed Liepa's exact instructions. When she tried to defend herself by presenting the facts, Liepa told Steinberg to "shut the fuck up!" Steinberg was speechless. She left work early, taking a day of her earned time off, and, within hours, emailed her two-week notice to HR, but received no response.

15.     When Steinberg returned to work on August 29, she was called into a meeting with the HR Manager and the Managing Director, who told her she did not have to work the last two weeks.

16.     Upon information and belief, Defendants have, to date, negligently kept Liepa in their employ, allowing the hostile work environment she has created to proliferate and failing to protect past, current, and future employees from such discriminatory and harassing treatment.

## PARTIES

17.     Plaintiff Ahouva Steinberg is a gay, Jewish woman who suffers from asthma. She was jointly employed by Defendants as manager of the property known as 3Thirty3, located at located at 333 Huguenot Street, New Rochelle, New York 10801, from February through August of 2022. At all relevant times, Steinberg resided in New Jersey.

18.     In her role as 3Thirty3 Property Manager, Steinberg officially reported to Liepa; however, Mitch Bodner, the Senior Vice President of Development and Asset Management for the Cappelli Organization, also directly supervised both Steinberg's and Liepa's job performance on a day-to-day basis and exercised substantial and ongoing control over their work-related activities.

19.     As Property Manager, Steinberg worked 12-hour days, Monday through Friday, managing a leasing team of five employees who worked Wednesday through Sunday. Steinberg was therefore required to be available each weekend to respond to her leasing team as needed.

### *Cushman & Wakefield Defendants:*

20.     Defendant Cushman & Wakefield, Inc. is a domestic business corporation with its principal place of business in New York at 1290 Avenue of the Americas, New York, New York 10104. Cushman & Wakefield, Inc. is a subsidiary of Cushman & Wakefield PLC, a publicly traded, multi-billion-dollar, global real estate services firm headquartered in Chicago, Illinois. At

4

all times relevant, Cushman & Wakefield Inc. supplied building management services for the property known as 3Thirty3, located at 333 Huguenot Street, New Rochelle, New York 10801.

21.     Defendant Cushman & Wakefield 1, Inc. is a domestic business corporation and subsidiary of Cushman & Wakefield PLC with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

22.     Defendant Cushman & Wakefield Capital Services, LLC is a foreign limited liability company headquartered in Delaware and subsidiary of Cushman & Wakefield PLC with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

23.     Defendant Pinnacle Property Management Services, LLC is a domestic limited liability company with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104. In 2020, Cushman & Wakefield acquired Pinnacle Property Management Services, LLC, and this entity appears on Steinberg's W-2 tax form.

*Cappelli Defendants:*

24.     Cappelli Development, LLC, Cappelli Organization, LLC, and/or RFMCH Huguenot Property Owner, LLC are, upon information and belief, a group of affiliated entities owned and/or controlled by real estate developer and Cappelli Organization CEO Louis Cappelli. The Cappelli Organization is headquartered in Westchester, New York with their principal place of business at 7 Renaissance Square, 4th Floor, White Plains, New York 10601. At all times relevant, one or more of these entities partly owned and fully controlled the property known as 3Thirty3. Cappelli Defendants were a client of Cushman & Wakefield, and at all times relevant, one or more of these entities jointly employed Steinberg, along with Cushman & Wakefield.

*Joint Employment*

25.    3Thirty3 was owned by one or more of the Cappelli Defendants (hereinafter, "Cappelli Organization").[1] The Cappelli Organization hired Cushman & Wakefield to supply a property management team and manage the daily business of 3Thirty3; in this sense, the Cappelli Organization was a "client" of Cushman & Wakefield.

26.    However, the Cappelli Organization was highly involved in Cushman & Wakefield's management of 3Thirty3 and exerted a great deal of control over the management team such that the two entities jointly employed Steinberg as Property Manager of 3Thirty3.

27.    For example, the Cappelli Organization controlled and directed the hiring process for the Cushman & Wakefield property management staff at 3Thirty3. Indeed, Louis Cappelli had personally interviewed and hired Liepa.

28.    Liepa interviewed Steinberg, as did Bodner and Bruce Berg, two high ranking employees of the Cappelli Organization, who made the final decision to hire her.

29.    Bodner visited 3Thirty3 several times per week and kept in constant contact with its Cushman & Wakefield management team; through Bodner, the Cappelli Organization had the final say in all management decisions, including, but not limited to, all hiring and firing decisions regarding Cushman & Wakefield employees working at or for 3Thirty3.

30.    On a number of occasions, Liepa stated that Bodner might fire Steinberg and/or that Bodner was looking for someone to replace Steinberg as property manager.

---

[1] According to the Cappelli Organization's official web site, 3Thirty3 is owned by "Cappelli Organization Affiliate." *https://cappelliorg.com/portfolio/3thirty3/* (last viewed February 28, 2023). Until quite recently, however, the same web site listed 3Thiry3's owner as "Cappelli Development and Related Management Fund." Because it is not readily apparent exactly which Cappelli entities owned 3Thirty3 during the period of Steinberg's employment, Plaintiff generally refers to the owning entity/joint employer as the "Cappelli Organization" herein.

31.    Liepa also stated numerous times that she thought Bodner might terminate her own employment.

32.    Bodner and Berg also interviewed and granted prior approval for all managers, assistant managers, and maintenance supervisors – who were all hired by Liepa and/or Steinberg during the period of Steinberg's employment, including, but not limited to, Chappelle, who was hired approximately three weeks after Steinberg.[2]

33.    For example, Bodner emailed and texted Steinberg numerous times per day, including some weekends. He gave her instructions on a variety of items including job postings, hiring, building signage, event promotion, parking issues, vendor issues, hardware issues, apartment staging, utilities, and repairs.

34.    Bodner also required Steinberg to send him a daily leasing report and obtain his approval on mundane decisions including the color and font of resident event flyers.

35.    Many weekends, Bodner either told Liepa to call Steinberg regarding work-related matters or called Steinberg directly.

36.    Bodner also required Steinberg to have weekly pricing meetings with him, whereas the standard at other properties was to have such meetings monthly.

37.    On one occasion in the summer of 2022, when the air conditioning in the management office wasn't working properly, Bodner required Steinberg to go to Home Depot and purchase three air conditioning units on her own personal credit card.

---

[2] However, in June 2022, after Steinberg and Bodner interviewed various applicants for the position of Superintendent, Bodner vetoed the applicant Steinberg wished to hire and required her to hire another applicant named Cliff Paulino instead. In all instances during the period of Steinberg's employment, neither Steinberg nor Liepa could hire anyone on behalf of Cushman & Wakefield without Bodner's consent on behalf of Cappelli Development.

38.     During the week of July 11, 2022, when tenants began moving into 3Thirty3 and there was dust in some of the units due to ongoing construction, Louis Cappelli met with Steinberg in the management office and directed her to issue each tenant a $1000 check for the inconvenience, to be paid out of Cappelli's personal bank account. Bodner insisted on personally drafting the letter that went out to tenants along with the checks.

39.     Louis Cappelli also directed Steinberg to issue subsequent inconvenience checks to tenants out of his personal account in various lesser amounts for the next several weeks.

40.     On another occasion in late August 2022, Bodner directed Steinberg to issue $500 inconvenience checks as a "customer service gesture" due to a hardware issue with apartment key fobs.

41.     Bodner required Steinberg to notify him first whenever there was an issue with utilities such as Wi-Fi or electricity, so that he could instruct her on exactly what steps to take, including whom to contact and what to tell them. Bodner also insisted on being copied on all such communications as well as all communications with vendors generally.

42.     Also in Summer 2022, Bodner misunderstood an email Steinberg sent to ConEdison confirming the residents' utilities billing at 3Thirty3. Bodner replied-all to the thread in all capital letters, demanding that "EVERYONE STOP" the billing process immediately. Bodner then called Steinberg and harshly reprimanded her for approving the ConEdison billing without his permission. Bodner screamed at Steinberg that she and Liepa had "no authority to approve anything" and declared: "Everything has to go through me."

43.     Steinberg explained to Bodner that he appeared to have misread her email to ConEdison. Bodner grudgingly acknowledged his misunderstanding regarding the substance of the email but

nonetheless insisted that Steinberg and Liepa were not to sign off on anything or make any management decisions without his prior approval.

44.    On another occasion, when Steinberg executed a mundane management decision based on Liepa's approval without first seeking Bodner's, Bodner reprimanded Steinberg for not coming to him first. Bodner stated in no uncertain terms that Steinberg should first seek his approval, and not Liepa's, before making any management decisions.

45.    Liepa often complained to Steinberg about Bodner's constant supervision and unusual degree of control over her day-to-day workflow. Liepa told Steinberg on more than one occasion that Bodner was usurping her role as Regional Property Manager and rendering her useless at 3Thirty3.

46.    Indeed, Steinberg was surprised by the Cappelli Organization's unusual degree of involvement with building management minutia and the day-to-day workflow of 3Thirty3's Cushman & Wakefield property management team. Typically, when a property owner hired Cushman & Wakefield or another such firm to manage its property, the owner would normally step back and let the management firm handle the day-to-day building management affairs. The Cappelli Organization's constant control over such matters was not something Steinberg had expected or seen to that extent before.

47.    The Cappelli Organization also directly funded Cushman & Wakefield's payroll account for all Cushman & Wakefield employees working at or for 3Thirty3, and actively monitored this payroll account at all times relevant.

48.    For example, Bodner regularly directed hourly employees not to exceed 40 hours per week to avoid overtime wages. On one occasion during Steinberg's employment, Bodner refused to fund this payroll account until a "payroll miscellaneous fee" of $1.34 was resolved.

49.    At Bodner's behest, Liepa also required Steinberg to answer work calls and assist the property's concierge team as needed throughout the weekends. One Saturday when Steinberg missed a call, Liepa became angry with her and warned her never to miss a weekend call again.

50.    One evening, after Steinberg had worked until 11:00pm one night hosting a resident event at 3Thirty3, Liepa gave Steinberg permission to come in late the next day. However, the following morning at 10:00am, Bodner arrived at the management office and told Liepa it was unacceptable that Steinberg was not at work, regardless of how late she had worked the night before. Liepa then relayed this reprimand to Steinberg on Bodner's behalf.

51.    Defendants all had immediate control over Steinberg, including the power to pay her salary, hire, fire, or otherwise control her daily activities.

## JURISDICTION AND VENUE

52.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, as Plaintiff has asserted claims that arise under federal laws of the United States, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332, as Plaintiff resides in New Jersey. This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

53.    Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiff's claims occurred within the Southern District of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

54.    On November 3, 2022, Steinberg filed a timely Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") as to her Title VII and ADA claims.

55.    On May 31, 2024, the EEOC issued Steinberg a Notice of Right to Sue.

**FACTS**

56.    Defendants hired Steinberg as a Property Manager in February 2022.

57.    As Property Manager, Steinberg managed the new 285-unit residential property known as 3Thirty3, which was still under construction and uninhabited at the time.

58.    Steinberg's primary job duties included touring the construction site with prospective lessees for one to two hours per day to show them the amenities under construction.

59.    Steinberg also managed the property's leasing and 24/7 concierge teams, ensured timely construction for move-ins, oversaw move-ins, coordinated cleaning vendor services, and constant communicated with the property's owners regarding a wide variety of property management matters large and small.

60.    In this role, Steinberg was directly supervised by Regional Property Manager Maya Liepa. Liepa managed four Property Managers, including Steinberg.

61.    Prior to working for Defendants, Steinberg and Liepa both worked for Broad Management Group, where they were both regional managers traveling to different locations and rarely saw each other in person. During this time as peers, they had a friendly rapport. In fact, after leaving Broad Management Group, Liepa personally recommended Steinberg as a candidate for the Property Manager role at 3Thirty3 and sent Steinberg multiple text messages requesting Steinberg leave her current job to come work for her.

*Hostile Work Environment & Disparate Treatment*

62.    However, once Steinberg started her employment at 3Thirty3 and Liepa became her supervisor, their relationship changed.

11

63.     In March 2022, on Steinberg's very first day, Liepa told her that the Cappelli

Organization had "only" approved Steinberg's hire "because [Steinberg is] pretty."

64.     A few days later, during a meeting between Steinberg, Liepa, and the Cappelli

Organization, CEO and President Louis Cappelli bizarrely asked Steinberg how old she was.

Steinberg hesitantly responded that she was in her twenties, to which Cappelli responded:

"There's a bunch of good-looking men in the back who would love to meet you."

65.     Liepa did nothing to intervene.

66.     After the meeting, Steinberg reported to Liepa that these comments had made her

uncomfortable. Rather than address Steinberg's concerns, Liepa snapped back: "That's just how

the industry is. Clients are allowed to say whatever they want!"

67.     Liepa openly stated that she preferred to work with men because men are "easier to work

with" than women. Liepa also explained to Steinberg that men made better employees because

they were "less emotional," adding, "Shamon [a male employee] never gets emotional."

68.     In March 2022, while Steinberg and Liepa were interviewing Tenisha Small for the

position of Leasing Agent, Steinberg told Small that, if she were hired, she would need to wear

more makeup. Liepa also instructed Small to remove her false eyelashes and shorten her

fingernails.

69.     To be clear, there was no element of the job Small was applying to that required Small to

conform to this standard of beauty.

70.     After this interview, Steinberg told Liepa that she was uncomfortable with Liepa's

inappropriate focus on Small's physical appearance. Liepa doubled down and responded: "If

they want to work with me, they need to be able to handle it."[3]

---

[3] Cappelli Organization Asset Manager Mitch Bodner subsequently approved Small's hire for the position of
Leasing Agent at 3Thirty3.

71.    Indeed, Liepa inappropriately fixated on her female employees' appearances and instructed them to always wear makeup and high heels to work. There was no valid reason to require that Steinberg and her female colleagues fit this stereotypical ideal of feminine beauty, particularly those like Steinberg, whose job responsibilities involved touring a construction site in hardhats on a day-to-day basis.

72.    Nonetheless, Liepa frequently pressured Steinberg and other female employees to "look hot" in the workplace, declaring that "sex sells."

73.    Liepa also made vulgar and humiliating comments about Steinberg's body. For example, Liepa repeatedly remarked upon Steinberg's weight and "ass" in the presence of numerous witnesses, often commanding Steinberg to "turn around and show me your ass" or "show everyone your ass" during business meetings with other property managers and their teams.

74.    Liepa also repeatedly told Steinberg: "I want your ass." Liepa generally focused a great deal of attention on Steinberg's physique, demanding to know her weight on countless occasions. Steinberg repeatedly said that her weight was irrelevant, but Liepa continued to ask Steinberg what she weighed.

75.    Starting in May 2022, Liepa repeatedly asked Steinberg: "Have you ever fucked a Scorpio?", referring to her boyfriend who was a Scorpio. Steinberg declined to answer the question as she did not want to engage in a conversation about their sex lives. Undeterred, Liepa proceeded to ask it several more times throughout the course of Steinberg's employment.

76.    Throughout the course of Steinberg's employment, Liepa also continually harassed Steinberg, who is gay, regarding her sexual orientation. For example, Liepa initially told Steinberg that she "didn't look gay" and warned Steinberg not to tell anyone she was gay. Later on, she regularly insisted that Steinberg would or should "fuck a man."

13

77.    When men who Liepa deemed to be attractive appeared on the property, Liepa often asked Steinberg: "Would you fuck *him*?" and/or inform her: "You *know* you would fuck *him*!" and numerous other comments to that effect. On these occasions, Steinberg would either ignore Liepa's comments, or, on some occasions, she told Liepa that these comments were inappropriate in the workplace. However, Liepa continued to remark on men she felt Steinberg should or would "fuck."

78.    Indeed, rather than heed Steinberg's opposition to the harassing comments, Liepa only escalated her harassment of Steinberg.

79.    On May 25, partly due to the dust from the construction site and partly due to the emotional distress caused by the hostile and toxic work environment, Steinberg suffered an asthma attack in the workplace and had to leave at 3:00 p.m. on a Wednesday afternoon to use her nebulizer.

80.    Liepa was openly annoyed by Steinberg's departure and spoke about her medical condition in a sarcastic tone. According to witnesses, after Steinberg left the office, Liepa rounded up Steinberg's direct reports and interrogated them about Steinberg's job performance in an effort to dig up dirt on her. When this effort failed, Liepa cornered Small and stated: "I need a snitch. I need you to spy on Huvi [Steinberg] and tell me everything she does."

81.    In Summer 2022, Steinberg mentioned she was having problems with her girlfriend while eating lunch with several coworkers, when Liepa asked Steinberg in front of her coworkers: "Why don't you just fuck a man and shut up about it?"

82.    These outrageous comments about Steinberg's sexual orientation, as well as the comments regarding Steinberg's weight and "ass" were utterly humiliating and demoralizing to Steinberg.

83.     Shortly afterwards, Steinberg broke up with her girlfriend, which she ultimately told Liepa about after Liepa asked her repeatedly.

84.     After learning that Steinberg had broken up with her girlfriend, Liepa began regularly asking Steinberg: "Do you think I'm pretty?"

85.     Liepa also asked Steinberg, "Am I pretty in the *gay* world?" and "would you ever be attracted to *me*?" In response, Steinberg tactfully explained that Liepa wasn't her type.

86.     Liepa also began to speak to Steinberg in lewd and graphic detail about her own sex life. For example, at a work lunch in June 2022, Liepa informed Steinberg: "You need a dick that can reach your soul. When my fiancé fucks me and I can feel his penis deep inside me, I feel like he's fucking my soul!" These graphic sexual anecdotes from her supervisor made Steinberg feel extremely uncomfortable.

87.     Also in June 2022, Liepa informed Steinberg: "Some asshole is suing me for race discrimination," adding, "my fiancé is Black, so how could I be racist?"

88.     Liepa also subjected Leasing Consultant Alexandra Hisarliyan to similar remarks, telling her that she loved having sex with "Black men" and raving to her about how "good" sex with her fiancé was.

89.     On June 28, Liepa texted Steinberg a picture of a thermometer, asking "[d]oes this look like a penis?"

90.     These bizarre, sexually explicit overtures by her supervisor mortified Steinberg and made her feel extremely uncomfortable in the workplace. However, Steinberg was terrified of going to HR as she knew of Liepa's vengeful inclinations and feared further retaliation.

91.     Liepa also made numerous antisemitic comments in the workplace. For example, she repeatedly referred to Bodner as a "cheap Jew" and "Hitler" when speaking with Steinberg and other employees including Hisarliyan and Small.

92.     In July, Liepa asked Bodner what his Zodiac sign was. When he replied that he was a Taurus, Liepa responded: "That makes sense, just like Hitler!" Bodner stared at Liepa and did not respond, but he was visibly upset throughout the rest of the meeting.

93.     When Steinberg, who is also Jewish, opposed this behavior and complained to Liepa that it was "antisemitic," Liepa called Steinberg a "snowflake," dismissing her complaint entirely.

94.     Liepa then doubled down on her antisemitic remarks. For example, Liepa repeatedly referred to Broad Management Group as "cheap Jews."

95.     In July, Liepa complained to Steinberg, Hisarliyan, and Small about the "Jewish kids" at her son's summer camp, sneering "you know how the Jews are."

96.     Liepa then began calling Steinberg "stupid," "dumb," and a "fucking idiot" on a regular basis.

97.     On July 18, Steinberg suffered another asthma attack on her way to work and notified Liepa that she was going directly to urgent care. Without any concern for Steinberg's health or wellbeing, Liepa became angry and ordered Steinberg to report directly to the office after her emergency treatment.

98.     At urgent care, Steinberg was diagnosed with an acute asthma attack as well as an upper respiratory infection and treated with a nebulizer, oxygen, and a steroid shot. Liepa called and texted Steinberg repeatedly throughout her emergency treatment, pestering her with work questions and complaining about her absence.

99.    Steinberg decided to go back to the office after leaving urgent care and called Liepa on her way back. Instead of Liepa asking how Steinberg was doing, she took the opportunity to yell at her about an email to Bodner that had bounced due to the attachment size. When Steinberg reached the office, Liepa rebuked her for coming in late and complained about how long her emergency treatment had taken.

100.    Steinberg explained that she didn't ask for this and would rather be healthy at work. Liepa made her feel so awful for needing emergency medical care that Steinberg actually apologized to Liepa for the inconvenience.

101.    In late July, Liepa told Hisarliyan that she had a "big-ass booty." Hisarliyan told Liepa she did not appreciate this comment.

102.    Rather than apologize or take any responsibility, Liepa retaliated by hyper-scrutinizing Hisarliyan's job performance. Indeed, in early August 2022, Liepa told Steinberg and Bodner that she wanted to fire Hisarliyan. Bodner replied on behalf of the Cappelli Organization that Liepa would have to place Hisarliyan on a Performance Improvement Plan ("PIP") before firing her to avoid "getting sued" and/or having to "pay unemployment."

103.    Liepa later told Steinberg that, instead of firing Hisarliyan, she would just "bully [Hisarliyan] into leaving" to save the time and effort of placing Hisarliyan on a PIP per Bodner's instruction.

104.    Liepa went about this by habitually berating Hisarliyan, telling her she was "crazy," throwing a hardcopy file at her (see *infra*), and repeatedly slamming her office door in Hisarliyan's face when she greeted her through the doorway.

105.    On August 3, Liepa emailed Steinberg directing her to come into her office "NOW." When Steinberg entered Liepa's office, Liepa yelled at her to close the door and claimed to have

received an email complaint about Steinberg from a client. She proceeded to yell at Steinberg for a painful fifteen minutes.

106.    Steinberg asked to see the email, and Liepa showed it to her. Upon reading the email, Steinberg saw that it was not a complaint against her but rather about male Assistant Property Manager Brian Chappel.

107.    Liepa eventually admitted that the complaint was about Chappel instead of Steinberg, but, when Chappel arrived at her office, Liepa approached him with a smile and very gently explained that there was "just a little issue" regarding a complaint about his customer service. The stark contrast between Liepa's treatment of Steinberg, who wasn't even the subject of the complaint, and Chappel, the true culprit, was a blatant gender-based double standard.

108.    Later that day, Steinberg told Liepa that the work environment had become intolerable, adding, it was "overwhelming," "exhausting," and "I work 12 hours every day and leave in tears." In response, Liepa laughed and said, "You cried?! It's so embarrassing that women cry at work!"

109.    On several subsequent occasions, Liepa mocked Steinberg about her crying, telling other employees: "Don't make Huvi [Steinberg] cry!"

110.    Also during the first week of August, in a team meeting, Liepa told Hisarliyan and Small that they were "fucking idiots." While Liepa had also called Steinberg a "fucking idiot" on more than one occasion, Liepa never addressed male employees with profanity or called them names.

111.    In or about the second week of August, Liepa threw a heavy file at Hisarliyan and declared: "When people fuck up a file I throw it across the desk in their face – that's my

management style." Notably, however, Liepa never threw files at male employees or abused them in this way, even when they made errors.[4]

112.    Hisarliyan promptly reported this incident and others to HR, but HR failed to take any action. On August 12, Hisarliyan finally resigned, just as Liepa had planned.

113.    In or about mid-August 2022, 3Thirty3 resident Laurean Gari, who had worked with Liepa in the past, told Steinberg that Liepa was "infamous in Westchester" for inspiring discrimination complaints and fleeing various companies in the wake of such complaints.

114.    According to Small and a concierge named Danisha [last name unknown], two separate leasing agents from other companies who had toured 3Thirty3 had also told them the same.

115.    By mid-August 2022, Steinberg was deeply depressed because of the hostile work environment and had begun to experience suicidal ideation, which she discussed in detail with her therapist.

116.    Toward the end of August 2022, Small confided in Steinberg that, the prior month, Liepa had publicly ridiculed Small's body, proclaiming: "Your ass is too big!" Small shared that she was humiliated and had cried over this comment, but Liepa had shown no remorse whatsoever.

117.    Around that time, Steinberg became so distressed with her working environment that she had to schedule an emergency appointment with her psychiatrist, who prescribed a new antidepressant and increased the dosage.

118.    The last week in August, Steinberg learned that a number of other female employees including Small, Hisarliyan, and a 3Thirty3 concierge named Denisha [last name unknown] all

---

[4] Liepa further recommended that Steinberg throw files in the faces of her own direct reports as a means of managing them. When Steinberg refused, Liepa accused her of weak management.

complained to HR about Liepa's unlawful conduct, but, instead of taking remedial action, Defendants turned a blind eye to the problem and closed ranks around Liepa.[5]

119.    Upon information and belief, Defendants knew of Liepa's propensity for harassing employees and creating a hostile work environment long before Steinberg complained, but, even after several recent complaints by Steinberg and her colleagues, Defendants have negligently retained Liepa without any remedial action nor any regard for the rights or safety of their other employees.[6] The foregoing unlawful discrimination caused Steinberg tremendous emotional distress as well as lost wages and various other damages.

***Steinberg's Protected Complaints of Discrimination Fall on Deaf Ears***

120.    On Thursday, August 25, Steinberg emailed a detailed complaint to HR under the subject heading: "Hostile Work Environment." This email, which summarized Liepa's unlawful conduct, was forwarded to HR Manager Dawn Short-Austin with Steinberg copied, but Short-Austin did not respond.

121.    Later that day around 4:00pm, Liepa called Steinberg in a rage and falsely accused her of failing to follow an instruction that she claimed was in an email – but the email contained no such instruction. When Steinberg told Liepa that her email did not contain this alleged instruction, Liepa insisted otherwise. Steinberg then read the one-line email aloud to Liepa to prove that it contained no such instruction, and Liepa screamed: "Oh my god, shut the fuck up!"

---

[5] As Regional Property Manager, Liepa managed three women and one man — Shamon Nowling. Liepa treated Nowling in a friendly and collegial manner and easily forgave his mistakes while treating female employees with derision and chastising them with profanity for the slightest alleged misstep.

[6] Further, upon information and belief, Liepa is a serial harasser who has been fired or asked to resign from at least three other companies due to her outrageous and discriminatory behavior.

122.    Unable to take the abuse any longer, Steinberg hung up the phone and burst into tears. Assistant Property Manager Chappel offered to cover Steinberg's duties, and Steinberg went home early to recover.

123.    The following day, Friday August 26, Steinberg was so distressed that she called out of work, using one of her earned and accrued vacation days. Throughout the day, Steinberg experienced panic attacks at the thought of returning to work under Liepa.

124.    That afternoon, Steinberg realized she could not remain at the company any longer and emailed her two weeks' notice of resignation to Short-Austin, explaining: "I no longer feel safe working in this hostile environment." She did not receive a response.

125.    On Sunday night, August 28, Steinberg emailed Short-Austin once again, stating that she was wracked with anxiety and "afraid to come to work" under Liepa on Monday.

126.    Since she had not heard from anyone in response to her emails, Steinberg reported to work the following morning on Monday, August 29. Liepa completely ignored Steinberg and refused to acknowledge her presence, while simultaneously ordering Steinberg's team around as though Steinberg was not there.

127.    That afternoon, Short-Austin finally responded to Steinberg's emails, vaguely stating that "employee relations" would be contacting Steinberg about her complaint.

128.    On August 29 at 3:00 p.m., Short-Austin and Managing Director Keith Tartamella summoned Steinberg to a video conference. On the video call, Steinberg asked for permission to record the discussion; Short-Austin became irate, yelling "absolutely not!" Short-Austin continued to yell about this gratuitously for several more minutes, repeatedly warning Steinberg to stop the recording.

129.    Once she was satisfied that Steinberg was not recording, Short-Austin sternly declared: "We are not here to discuss the details. We are just here to let you know that we understand you feel uncomfortable working here."

130.    Short-Austin then said Defendants would pay Steinberg out for her two weeks' notice, and her services were no longer required, effective immediately.

131.    Short-Austin specified that Steinberg's immediate departure was "in your best interest and, let's be honest, in ours too." Short-Austin told Steinberg to leave her laptop and keys on her desk and ended the call.

132.    The following day, People Partnering Manager Marlea Pickett called Steinberg to discuss her allegations against Liepa. Pickett stated that HR would "make an inquiry" into Steinberg's complaint. Steinberg asked Pickett if anyone would get back to her regarding this "inquiry" or its outcome. Pickett said no and ended the call.

### FIRST CAUSE OF ACTION:
### Discrimination in Violation of Title VII
### Against all Defendants

133.    Steinberg repeats and alleges each allegation set forth above.

134.    Defendants unlawfully discriminated against Steinberg in the terms and condition of her employment on the basis of her Jewish religion and/or gender in violation of Title VII.

135.    As a result, Steinberg has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

136.    Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Steinberg's federally protected rights.

137.    Steinberg is entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

**SECOND CAUSE OF ACTION:**
**Discrimination in Violation of § 1981**
**Against all Defendants**

138.    Steinberg repeats and realleges each allegation set forth above.

139.    Defendants unlawfully discriminated against Steinberg in the terms and condition of her employment by subjecting her to disparate treatment and a hostile work environment based on her Jewish ethnicity in violation of § 1981. As a result, Steinberg has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

140.    Defendants willfully engaged in these discriminatory acts and omissions with malice and/or reckless indifference to Steinberg's federally protected rights.

141.    Steinberg is therefore entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

**THIRD CAUSE OF ACTION:**
**Discrimination in Violation of the NYSHRL**
**Against all Defendants**

142.    Steinberg repeats and realleges each allegation set forth above.

143.    Defendants unlawfully discriminated against Steinberg in the terms and conditions of her employment by subjecting her to disparate treatment and a hostile work environment on the basis of her gender and/or sexual orientation, and/or Jewish ethnicity, and/or disability, in violation of the NYSHRL. As a result, Steinberg has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

144.    Defendants willfully engaged in these discriminatory acts and omissions with malice and/or reckless indifference to Steinberg's rights.

145.    Steinberg is therefore entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

23

## FOURTH CAUSE OF ACTION:
### Discrimination in Violation of the NYCHRL
### Against all Defendants

146.    Steinberg repeats and realleges each allegation set forth above.

147.    Defendants unlawfully discriminated against Steinberg in the terms and conditions of her employment by subjecting her to disparate treatment and a hostile work environment on the basis of her gender and/or sexual orientation, and/or Jewish ethnicity, and/or disability, in violation of the NYCHRL.

148.    As a result, Steinberg has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

149.    Defendants willfully engaged in these discriminatory acts and omissions with malice and/or reckless indifference to Steinberg's rights.

150.    Steinberg is therefore entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

## FIFTH CAUSE OF ACTION:
### Discrimination in Violation of the ADA
### Against all Defendants

151.    Steinberg repeats and realleges each allegation set forth above.

152.    Defendants unlawfully discriminated against Steinberg based on her disability and/or perceived disability in violation of the ADA.

153.    As a result, Steinberg has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

154.    Defendants willfully engaged in these discriminatory acts and omissions with malice and/or reckless indifference to Steinberg's rights.

155.    Steinberg is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## DEMAND FOR RELIEF

WHEREFORE, Steinberg respectfully requests that this Court enter judgment in her favor:

a) on the First, Second, Third, Fourth, and Fifth Causes of Action, awarding emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, interest, and costs, in an amount to be determined by the trier of fact;

b) such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Steinberg demands a trial by jury.

Dated: Brooklyn, New York
August 27, 2024

Respectfully submitted,

Hilary J. Orzick
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
hilary@crumiller.com